<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BENJAMIN A. ELLIOTT,<br><br>    Petitioner,<br><br>    v.<br><br>STACY A. ELLIOTT,<br><br>    Respondent. | No. 25cv14678 (EP) (AME)<br><br>**OPINION** |

**PADIN, District Judge.**

*Pro se* Petitioner Benjamin A. Elliott filed a Verified Petition seeking to secure the return of his and Respondent Stacy A. Elliott's son, M.A.E, based on Respondent's alleged wrongful removal of M.A.E. from Germany to the United States of America in violation of the Hague Convention and the International Child Abduction and Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-11, D.E. 1 ("Petition"). Respondent moves to dismiss the Petition pursuant to Federal Rule of Civil Procedure 12(b)(6). D.E. 8 ("Motion" or "Mot."). Petitioner opposes. D.E. 13. Petitioner filed a declaration as a reply. D.E. 17. The Court also *sua sponte* considers the need for appointing Petitioner pro bono counsel pursuant to 28 U.S.C. § 1915(3).

The Court decides the Motion and the need for pro bono counsel without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court will **DENY** Respondent's Motion, and for good cause shown, the Court will **ORDER** the appointment of pro bono counsel for Petitioner.

I.      **BACKGROUND**[1]

Petitioner and Respondent were married on March 29, 2018, in New Brunswick, New Jersey. Petition at 342. Respondent is a citizen of the United States. *Id.* at 340. Petitioner is a citizen of the United Kingdom and Germany. *Id.* at 336-37. Together, Petitioner and Respondent had a child, M.A.E., in New Jersey on December 29, 2021. *Id.* at 335. M.A.E. is a citizen of both Germany and the United States. *Id.* at 338-39.

There appears to be a documented history of domestic violence between Petitioner and Respondent. For example, on January 12, 2022, Petitioner texted Respondent "[D]on't assault me multiple times in front of [M.A.E.] and laugh about it." *Id.* at 18. Respondent replied saying "It's not funny that I assaulted you. I'm not going to be a good listener right now. I need to pay attention to when I'm feeling upset and triggered." *Id.* On January 15, 2024, Respondent texted Petitioner and said "I didn't want to call the police. We're in the home stretch for something we've been working on for 18+ months. Neither one of us should have put a finger on the other. Full stop." *Id.* at 19; *see id.* at 20-21 (Respondent stating "I told them we had an argument. I told them I swung first."); *id.* at 22 (Respondent stating "Prior to arriving in Berlin in January, [Petitioner] intimidated and then punched me repeatedly while we were packing. The police who responded saw visible injuries on my face and were under a legal obligation to arrest him. He spent 3 days in jail."); *see also id.* at 24 ("Mr. Elliott described an encounter with his wife reporting that she 'shoved [him] into a piece of furniture and threw a heavy jar hitting [him] in the leg causing bruising.' He stated that he contacted a domestic violence hotline to obtain guidance.").

---

[1] For purposes of the Motion, the Court accepts the factual allegations of the Petition as true and draws all inferences in the light most favorable to the Petitioner. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

2

On January 20, 2024, Petitioner, Respondent, and M.A.E. moved to Germany. D.E. 8-1 ("Respondent Decl.") ¶ 5. While in Germany, M.A.E. attended two daycare centers in Berlin: the Kindertagespflege Fliegernest daycare and the Kita Nord-West daycare. Petition at 3. M.A.E. received child benefits under German tax law ("Kindergeld"). *Id.* at 62. M.A.E. saw pediatricians in Germany. *Id.* at 71. Petitioner was M.A.E.'s primary caregiver and took M.A.E. to daycare, medical appointments, the park, and other activities. *Id.*; *see id.* at 76 ("Most of [the daycare's] contact was with his father. . . . In June, when I had to attend other appointments, [M.A.E.'s] mother came to pick [him] up (very rarely).").

Upon moving to Germany, Respondent applied for and obtained a visa permitting her to stay in Germany for at least three years before needing to renew her stay. *See id.* at 28 ("Just picked up my visa today. Nice to finally have it in hand! Now to work on getting to B1 proficiency before I've got to renew it in 3 years."). The parties obtained a tax identification number for M.A.E. *See id.* at 106. They also extended their lease in Berlin twice. *See id.* at 136, 149.

Petitioner and Respondent, however, separated in October 2024, though they continued to both live in Germany. *Id.* at 2. Petitioner and Respondent continued to care for M.A.E. *See id.* at 92 ("After the parents separated, nothing changed in the parents' dropping-off behavior. Mr. Elliott continued to take [M.A.E.] to daycare early. The father always took the time [M.A.E.] need[ed] when handing over, he did so with the necessary patience and calm so that [M.A.E.] could start the day well.").

Petitioner and Respondent worked with the German Youth Welfare Office (the "Jugendamt") and a family coparenting counseling service ("EFB"), which provided guidance over child custody and parental responsibilities. *Id.* at 176. Respondent did not comply with the Jugendamt's guidance or with the custody schedule provided by the EFP despite Petitioner's

3

protests. *Id.* at 177-78 (Petitioner stating, "You've made plans on the day the EFP allotted me to have him"). According to the Petition, Respondent would sometimes call the police and lie to them about Petitioner. *Id.* at 190-91 ("When the police arrived, they asked why she called and she said I was causing problems, intimidating her, the same usual lies."). On such occasions, the police would tell Respondent not to call the police unless a crime has been committed. *Id.* ("She was told again that you shouldn't contact the police unless a crime is committed. . . . This is the 3rd time she's called the police during an argument, the 2nd time in front of my son.").

It is not clear that guidance from the Jugendamt and EFP proved to be effective. In November 2024, Respondent flew to the United States with M.A.E. for about a week for Thanksgiving. *Id.* at 32-33. Respondent flew without Petitioner's consent but promised that she would return and acknowledged that if she "didn't come back, [she'd] be massively disrupting [M.A.E.'s] life, abandoning [her] cats, all the things in this apartment, breaking international law, and risking going to prison for child abduction." D.E. 8-3 at 58. Respondent and M.A.E. returned after this November trip.

In December 2024, Respondent requested custody of M.A.E. for December 30 and December 31 and represented to Petitioner that she had promised M.A.E. that she would take him to a New Year's Eve party. *Id.* at 29-30. In return for having M.A.E. on both consecutive days, Respondent promised Petitioner that he could take M.A.E. to his parents' home for M.A.E.'s third birthday on December 29, 2024. *Id.* Petitioner agreed. *Id.* Instead of taking M.A.E. to a New Year's Eve party, however, Respondent boarded a plane with M.A.E. and flew to the United States. *See id.* at 199. Respondent then texted Petitioner on December 31, 2024 that she was in the United States and did not intend to return to Germany. *Id.*

4

Petitioner pleaded with Respondent to return M.A.E. *Id.* at 5. Respondent did not return. *Id.* at 2. Petitioner then contacted the German police, and they issued summons for Respondent to appear. *Id.* at 5, 286. She, however, did not. The daycare centers that M.A.E. attended terminated their contracts with Petitioner over M.A.E.'s absence. *Id.* at 62, 213. Germany ceased providing Kindergeld benefits for M.A.E. because his residence was no longer in Germany. *Id.* at 62.

The Jugedamt advised Petitioner that his decision to report the abduction to the police was correct but that because M.A.E. was now in the United States, he would have to file suit in the United States for the recovery of his child. *See id.* at 211. Petitioner, applying to proceed *in forma pauperis* ("IFP") and *pro se*, thereafter filed the Petition in this Court on August 15, 2025 seeking the return of M.A.E. Petition. This Court granted Petitioner IFP status and directed the Clerk of Court to issue service on September 23, 2025. D.Es. 2 & 3. Petitioner served Respondent on October 28, 2025. D.E. 6. Respondent's Motion followed on November 14. Mot.

## II.   LEGAL STANDARDS

### A.   Motion to Dismiss[2]

Federal Rule of Civil Procedure 12(b)(6) permits district courts to dismiss a case for failure to state a claim. In reviewing a motion to dismiss for failure to state a claim, the reviewing court accepts all well-pleaded facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 233. The claims must "plea[d] factual content that allows the court

---

[2] Respondent titled her Motion "MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT," but Respondent then states that her Motion should not be treated as one for summary judgment unless and until all parties are "given the opportunity to present material to the court." Mot. at 1, 5 (quoting *Rose v. Bartle*, 871 F.2d 331, 340 (3d Cir. 1989)). because the parties are undergoing discovery and because, as explained in Section III, there are numerous questions of fact for this Court to make, this Court will treat Respondent's Motion only as a motion to dismiss.

5

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A "formulaic recitation of the elements of a cause of action" will not suffice, nor will allegations that require speculation to infer a plaintiff's entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The allegations themselves must show that a plaintiff is entitled to relief.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  As Petitioner proceeds *pro se*, however, the Court holds the Petition to a less stringent standard than one drafted by an attorney.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court may consider only the complaint, the exhibits attached thereto, matters of public record, and undisputedly authentic documents upon which the plaintiff's claims rely.  *Mayer v. Belichik*, 605 F.3d 223, 230 (3d Cir. 2010).

### B.  Appointment of Pro Bono Counsel

The Court has the discretion to *sua sponte* appoint pro bono counsel to *pro se* litigants. *Tabron v. Grace*, 6 F.3d 147, 156-57 (3d Cir. 1993).  A court's decision, however, must be based upon a threshold showing that the litigant's claim has "some merit in fact and law."  *Id.* at 155.  If the litigant's claims have merit, a court must then consider:

> (1) the [litigant's] ability to present his or her own case;
> (2) the difficulty of the particular legal issues;
> (3) the degree to which factual investigation will be necessary and the ability of the [litigant] to pursue such investigations;
> (4) the [litigant's] capacity to retain counsel on his or her own behalf;
> (5) the extent to which a case is likely to turn on credibility determinations; and
> (6) whether the case will require testimony from expert witnesses.

*Id.* at 155-57 (the "*Tabron* factors"); *see Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002). If the action is "truly substantial" and the litigant faces difficulty in presenting his case, "counsel should ordinarily be appointed."  *Tabron*, 6 F.3d at 156.

6

III.   DISCUSSION

    A.   **Respondent's Motion**

"To obtain an order for the child's return under the Hague convention, the petitioner bears the burden of proving by a preponderance of the evidence that the removal or retention was wrongful under Article 3." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006) (citing 42 U.S.C. § 11603(b)).[3]  Removal under Article 3 of the Hague Convention is "wrongful" where "(1) the child was habitually resident in one State and was removed to a different State; (2) the removal was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of removal." *See Benitez v. Hernandez*, No. 17-917, 2017 WL 1404317, at *2 (D.N.J. Apr. 18, 2017) (summarizing Art. 3, Hague Convention on the Civil Aspects of International Child Abduction Mar. 26, 1986, T. I. A. S. No. 11670, S. Treaty Doc. No. 99-11 (the "Hague Convention")); *see Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995).

If a Court finds that a child has been wrongfully removed or retained, the Court must order the child's return to the State of habitual residence unless the respondent proves one of two affirmative defenses. *Baxter v. Baxter*, 423 F.3d 363, 368 (3d Cir. 2005).  Respondent must either prove (1) by a preponderance of the evidence, that the petitioner consented to or acquiesced in the removal or retention of the child; or (2) by clear and convincing evidence, that the child would face a grave risk of harm or an intolerable situation upon return.  *Id.* (citing 42 U.S.C. § 11603(e)(2)).[4]

---

[3] 42 U.S.C. § 11603(b) has since been recodified at 22 U.S.C. § 9003(b).

[4] 42 U.S.C. § 11603(e)(2) has been recodified at 22 U.S.C. § 9003(e)(2).

7

Respondent moves for dismissal of the Petition, arguing that the facts pleaded show that the M.A.E. habitually resided in the United States, not in Germany, and therefore, there has been no wrongful removal. Mot. 2-3. Alternatively, Respondent moves to dismiss by arguing that M.A.E. would face a grave risk of harm upon returning to Germany. *Id.* For the reasons below, the Court finds neither of Respondent's arguments persuasive. Petitioner's recitation of the facts permits the reasonable inference that the M.A.E. was wrongfully removed under Article 3 of the Hague Convention in violation of ICARA and Respondent's arguments of harm do not demonstrate that *M.A.E.* would face a grave risk of harm upon return to Germany. Accordingly, the Court will **DENY** Respondent's Motion.

> 1. *Petitioner pleads that M.A.E. habitually resided in Germany and that he was wrongfully removed to another State*

The Hague Convention does not expressly define "habitual residence," but the Supreme Court has explained that the Hague Convention's "'negotiation and drafting history' corroborat[e] that a child's habitual residence" is the "place where a child is at home" at the time of the wrongful removal or wrongful retention. *Monasky v. Taglieri*, 589 U.S. 68, 76-77 (2020) (quoting *Medellín v. Texas*, 552 U.S. 491, 507 (2008)). This inquiry is a fact-driven one and "depends on the specific circumstances of the particular case." *Id.* No single fact is dispositive. *Id.*; *Kakkainen v. Kovalchuk*, 445 F.3d 280, 291 (3d Cir. 2006) ("The inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case.").

> i. Petitioner's pleaded facts support that Germany was the place of M.A.E.'s habitual residence

Here, Petitioner has pleaded, with abundant specificity, that M.A.E. habitually resided in Germany prior to Respondent's alleged wrongful removal. Petitioner provides documents

8

supporting that (1) M.A.E. resided in Germany for a significant period of time; (2) M.A.E.'s life had been integrated in Germany; and (3) the circumstances and the parties' actions demonstrated an apparent intent to remain in Germany indefinitely.

*First*, the parties agree that M.A.E. resided in Germany for a substantial amount of time. Petitioner, Respondent, and M.A.E. resided in Germany from January 20, 2024 through December 31, 2024, nearly a complete year. Because M.A.E. turned three years old only a week before Respondent's removal, the nearly year-long stay prior to removal is particularly indicative that M.A.E. habitually resided in Germany. *See Feder*, 63 F.3d at 224 (concluding that six months was "a significant period of time for a four-year old child").

*Second*, although M.A.E. was especially young, the parties had clearly settled M.A.E. into life in Germany. For example, the parties registered M.A.E. for Kindergeld public benefits and enrolled him in two daycare centers while there: the Kindertagespflege Fliegernest daycare and the Kita Nord-West daycare. Petition at 2-3. Attendance at daycare is a frequently considered factor in determining a child's place of habitual residence. *See Monzon v. De La* Roca, 910 F.3d 92, 106 n.88 (3d Cir. 2018); *Karkkainen*, 445 F.3d at 293 ("[A]cademic activities are among 'the most central . . . in a child's life' and therefore highly suggestive of acclimatization." (quoting *Feder*, 63 F.3d at 224)). The Minor Child also regularly saw a pediatrician in Germany. In fact, when Respondent planned to take M.A.E. to the United States for Thanksgiving and Petitioner requested assurances that Respondent would return, Respondent agreed that relocation back to the United States would "massively disrupt[t] [M.A.E.'s] life." D.E. 8-3 at 58 ("If I didn't come back, I'd be *massively disrupting his life*, abandoning my cats, all the things in this apartment, *breaking international law, and risking going to prison for child abduction*."). These actions demonstrate that M.A.E.'s life had settled in Germany. *Monzon*, 910 F.3d at 106 (affirming a district court's

finding of habitual residence based on its "thoughtful analysis of the evidence and the various factors that pertain to how well a child is settled in community and home").

*Third*, Petitioner has alleged facts, supported with exhibits, that the parties intended to remain indefinitely in Germany. Facts demonstrating that the parents chose to make a particular place their home indicates "the quality of being 'habitual.'" *Monasky*, 589 U.S. at 81. Indeed, for young children in particular, the actions and intentions of the caregiving parents are reliable indicators of the child's habitual residence. *Id.* at 78. Here, the parties enrolled M.A.E. in daycare not only for the 2024 year but also for the 2025 year. *Feder*, 63 F.3d at 224 (considering enrollment in school for the upcoming year in determining habitual residence). They signed a lease and extended it twice. *Id.* (considering the parties' purchase of a home in determining habitual residence). They obtained a tax identification number for M.A.E. in Germany and the parties agree that Respondent applied for a permit in Germany that would have allowed her to remain for at least three years. When Respondent traveled to New Jersey with M.A.E. to visit family for Thanksgiving, the trip was described as a *temporary* visit. Such facts strongly suggest that the parties' time in Germany amounted to more than a transitory trip. *Monasky*, 589 U.S. at 76 ("[R]esidence in a particular country can be deemed 'habitual,' however, only when . . . residence there is more than transitory.").

Petitioner therefore pleads more than sufficient facts to demonstrate that M.A.E. habitually resided in Germany.

    ii.    <u>Respondent's arguments that New Jersey was the place of M.A.E.'s habitual residence are unpersuasive</u>

*Monasky* advises that if a young child lives in a country "only because a caregiving parent had been coerced into remaining there," that fact "should figure in the calculus" of habitual residence. 589 U.S. at 78 (citing *Karkkainen*, 445 F.3d at 291). Respondent accordingly argues

10

that Germany could not have become M.A.E.'s place of habitual residence because she was coerced into moving there and remaining there. Petitioner's argument cannot be successful at this stage of the case for at least two reasons.

*First*, Respondent moves to dismiss under Rule 12(b)(6). To prove dismissal is warranted, she may rely on the Petition, the exhibits and documents that Petitioner relies upon, and matters of public record. *Mayer*, 650 F.3d at 230. Respondent's introduction of new facts and her invitation to consider material outside of the pleadings does not bear on whether Petitioner has pleaded facts that if true, would entitle him to relief. Because the parties dispute who is at fault for any domestic violence and therefore dispute whether Respondent moved to Germany and remained there voluntarily, a fact-intensive question,[5] Respondent's argument would instead be more appropriately considered at the summary judgment stage after more factual development or at an evidentiary hearing. The motion to dismiss stage is not the right one.

*Second,* Respondent relies on two unpersuasive and inapplicable district court opinions to suggest that her intentions regarding M.A.E. and Germany control the inquiry into habitual residence. Respondent relies on *In re Application of Ponath* to suggest that M.A.E.'s place of habitual residence never ceased being New Jersey despite living in Germany for eleven months. Mot. at 6 (citing 829 F. Supp. 363 (D. Utah 1993). But in *Ponath*, the parents traveled from Utah to Germany to visit family (similar to Respondent's Thanksgiving trip to visit family in the United States). *Id.* at 366. The parents there had purchased a round-trip ticket and represented that they

---

[5] Respondent's coercion argument is a fact-intensive one that would require determining not only whether Respondent voluntarily moved to Germany but also whether she voluntarily remained there for the eleven-month period that the parties lived there, including whether she voluntarily *returned* to Germany after a brief trip with M.A.E. to New Jersey for Thanksgiving—a trip she not only took *without* Petitioner, but one she took *over Petitioner's objections*. *See* Petition at 34 (attaching travel slip to New York from November 22, 2024, through November 29, 2024).

11

would return to Utah within three months. *Id.* Once there, however, Petitioner used abusive measures to keep Respondent and their child in Germany. *Id.* Under such circumstances, the *Ponath* Court declined to find that Germany had become the child's place of habitual residence. *Id.* at 367-68.

Not only are the facts of *Ponath* readily distinguishable from the circumstances here—where there is no allegation that the parties' relocation to Germany was ever intended or expected to be anything other than a new domicile—but *Ponath* was not a motion to dismiss case. *Ponath* is therefore inapplicable and cannot justify consideration of the factual disputes that Respondent raises on a motion to dismiss.

Respondent also relies on the district court's opinion in *Feder v. Evans-Feder* to again suggest that M.A.E.'s place of habitual residence never stopped being the United States. Mot. at 6-7. The district court's opinion in *Feder* is also inapplicable because it followed an evidentiary hearing, not a motion to dismiss. And it is additionally inapplicable as contrary to law because the very reasoning that Respondent relies on was rejected and vacated by the Third Circuit. 866 F. Supp. 860 (E.D. Pa. 1994), *vacated*, 63 F.3d 217 (3d Cir. 1995). There, the district court erred by determining that Australia did not become the child's new place of habitual residence because one parent had reservations about permanently relocating there, refused to surrender her United States identification, and took no steps to establish permanent residency in Australia.[6] *Feder*, 866 F. Supp. at 868. The Third Circuit vacated, finding that the district court erred by ignoring the six months the parties spent in Australia, by placing "undue emphasis" on the child's prior life in the United States, and by disregarding the intentions of both parents to exclusively and inexplicably focus on one parent's intentions. *Feder*, 63 F.3d at 224.

---

[6] As mentioned above, Respondent applied for long-term residency in Germany.

12

As *Monasky* advises, the Court, at the appropriate stage, will determine M.A.E.'s place of habitual residence by evaluating the "totality of the circumstances specific to [this] case." 589 U.S. at 71. The Court will not, as Respondent invites, decline to consider the very facts that the Supreme Court and the Third Circuit have explained are relevant.

Accordingly, neither case can justify concluding that Petitioner has not or cannot show that Germany became M.A.E.'s place of habitual residence merely because Respondent disputes having voluntarily relocated and remained there. Therefore, because Respondent's coercion argument is neither appropriate to consider nor dispositive of the outcome, the Court concludes that she has failed to demonstrate that Petitioner has inadequately pleaded that Germany was M.A.E.'s place of habitual residence at the time of removal.

> 2. *Petitioner pleads that Respondent breached Petitioner's custody rights under the laws of Germany*

Removal under Article 3 of the Hague Convention is not "wrongful" if the left-behind parent did not have custody rights over the minor child. *See Benitez v. Hernandez*, No. 17-917, 2017 WL 1404317, at *2 (D.N.J. Apr. 18, 2017) (summarizing Hague Convention, art. 3). "To make a custody determination, it is necessary to carefully examine 'the country of origin's custody laws to determine whether the party seeking the child's return had custody rights in that country . . . at the time the child was [removed].'" *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 275 (3d Cir. 2007) (quoting *In re Application of Adan*, 437 F.3d 381, 391 (3d Cir. 2006)). Pursuant to German law, married parents exercise joint custody over their children until and unless a court orders otherwise. *Kufner v. Kufner*, 519 F.3d 33, 39 (1st Cir. 2008) (citing German Civil Code § 1626(1)).

The parties agree that they were married prior to M.A.E.'s birth. The Jugendamt overseeing the parties' custody schedule also agreed that Respondent was not permitted to leave Germany

13

without returning. *See* Petition at 211. Petitioner (the left-behind parent) and Respondent therefore shared joint custody rights over M.A.E. under German law. Accordingly, Respondent breached Petitioner's custody rights when she fled Germany with M.A.E. Respondent does not dispute this.

       3.    *Petitioner adequately pleads that he had been exercising his custody rights at the time Respondent allegedly removed M.A.E.*

"[T]he test for finding the *non-exercise* of custody rights under the Hague Convention is stringent." *Baxter*, 423 F.3d at 368 (emphasis added). "If a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Id.* (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1065-66 (6th Cir. 1996)).

Petitioner pleads that Respondent lied to Petitioner for the purposes of obtaining enough time with M.A.E. to flee with him to the United States. There is no indication—nor does Respondent contend—that Petitioner abandoned M.A.E. at any point prior to Respondent's flight out of Germany.

       4.    *Respondent's affirmative defense does not justify dismissal, nor would it require denying the Petition at this stage*

Under Article 13(b) of the Hague Convention, courts need not "order the return of the child if the court finds that the party opposing return has established that return would expose the child to a 'grave risk' of physical or psychological harm." *Golan v. Saada*, 596 U.S. 666, 676 (2022) (citation modified). The "grave risk" affirmative defense is narrowly construed and must be proved by clear and convincing evidence. *Baxter*, 423 F.3d at 368 (citing 42 U.S.C. § 11603(e)(2)).

Respondent argues that even if Petitioner had pleaded a right to have M.A.E. returned to Germany, this Court should nevertheless decline to send him because Petitioner is abusive, and

14

M.A.E. would therefore be exposed to a grave risk of harm. Respondent's argument is unpersuasive on the record before this Court. Petitioner disputes Respondent's representations and this Court must accept Petitioner's allegations—not Respondent's—as true at this stage of the proceedings. Moreover, the grave risk inquiry requires "specific evidence of potential harm to the *child* upon his return." *Id.* at 374 (emphasis added). Yet, Respondent provides no evidence that Petitioner has or would abuse M.A.E. or that his behavior exposed M.A.E. to a risk of harm. Respondent's arguments therefore do not, at this stage, warrant either dismissal of the Petition or an early adjudication of the case against Petitioner.[7]

Respondent's representations regarding Petitioner's purported abuse of her, however, are troubling. *See* Respondent Decl. ¶ 9, 15-17, 21-23; D.E. 17 ¶ 3. This Court expects the parties to develop the record during discovery with respect to any psychological or physical abuse that M.A.E. would be exposed to if he were returned to Germany for custody proceedings.

Having presented no grounds to justify the dismissal of the Petition at this stage, this Court will **DENY** Respondent's Motion.

B.    **Appointment of Pro Bono Counsel**

The Court next *sua sponte* considers the *Tabron* factors and finds that the appointment of pro bono counsel to Petitioner in this case would aid the Court.

---

[7] Respondent does not raise a unique problem. Recognizing that "[d]omestic violence poses an 'intractable' problem in Hague Convention cases involving caregiving parents fleeing with their children from abuse," the Supreme Court explained that "[s]ettling the forum for adjudication of a dispute over a child's custody, of course, does not dispose of the merits of the controversy over custody. Domestic violence should be an issue fully explored in the custody adjudication upon the child's return." *Monasky*, 589 U.S. at 82; *see Abbott v. Abbott*, 560 U.S. 1, 20 (2010) ("Ordering a return remedy does not alter the existing allocation of custody rights, but does allow the courts of the home country to decide what is in the child's best interests. It is the Convention's premise that courts in contracting states will make this determination in a responsible manner.").

For the same reasons that this Court will deny Respondent's Motion, *supra* Section III.A, the Court finds that Petitioner's claims have "some merit in fact and law." *Tabron*, 6 F.3d at 156-57. Accordingly, the Court proceeds to consider the *Tabron* factors.

*First*, the Court considers the most significant *Tabron* factor: Petitioner's ability to proceed without counsel. *L.A. v. Hoffman*, 144 F. Supp. 3d 649, 678 (D.N.J. 2015). Petitioner's ability to present his case appears hampered by his lack of counsel. To start, Petitioner is not physically present in the United States. Further, the Petition spans over three hundred pages of unbookmarked exhibits that included uncertified translations. Petition. All documents were submitted as a single PDF, together with the Petition, inhibiting Petitioner's ability to present his case and identify discrete documents. While ICARA cases are expected to resolve within about six weeks, Hague Convention, art. 11, it took Petitioner about one month just to serve Respondent. *See* D.Es. 4, 6. It appearing that Petitioner has struggled to effectively prosecute this case *pro se*, this first *Tabron* factor weighs in favor of appointing pro bono counsel.

The second *Tabron* factor requires considering the complexity of the issues involved. ICARA actions raise "unique legal concepts" under "time-sensitive . . . proceedings." Federal Judicial Center, 1980 Hague Convention on International Child Abduction: A Resource for Judges (August 31, 2023). The second Tabron factor therefore also weighs in favor of appointing pro bono counsel.

*Third*, the Court considers the degree to which factual investigation will be required and the ability of an indigent plaintiff to pursue such investigation. Whether a child must be returned to its home country turns on fact-specific inquiries that regularly requires factual findings and an evidentiary hearing. While Petitioner has included an abundance of information in his Petition bearing on at least habitual residence, fact discovery is ongoing with respect to multiple issues.

16

*See* D.E. 14. Indeed, habitual residence is itself a "fact-driven inquiry" that depends upon consideration of "the totality of circumstances specific to the case." *Monasky*, 589 U.S. at 78, 84. The fact-heavy nature of a case brought over the abduction of a child therefore weighs in favor of appointing pro bono counsel.

The fourth *Tabron* factor considers the degree to which a case will turn on credibility determinations. *Tabron*, 6 F.3d at 156. Given the domestic violence disputes raised in this case and the diametrically opposing facts that both Petitioner and Respondent advance in their competing submissions, this Court expects critical factual determinations in this case to turn on evaluations of credibility. This factor therefore also weighs in favor of appointing pro bono counsel.

The fifth *Tabron* factor turns on whether there will be any need for expert testimony. *Tabron*, 6 F.3d at 156. Again, given the domestic violence disputes raised in this case (including allegations of financial abuse), there may be a need for expert testimony, but it is premature for the Court to tell. This factor is therefore neutral.

The final *Tabron* factor considers the plaintiff's need to attain and afford counsel. Petitioner proceeds IFP because he has shown that he cannot afford to pay the filing fees. D.E. 3. Petitioner's documents additionally indicate that he has attempted to obtain counsel in the United States, but it appears that he has been unable to because he lacks residency and citizenship. *See, e.g.*, Petition at 308. It is clear, therefore, that Petitioner lacks the ability to find and retain experienced counsel who can assist him with this overseas litigation. This last factor therefore weighs in favor of granting pro bono counsel as well.

In light of these circumstances, it appears that Petitioner may face difficulty or delay without the assistance of counsel in meaningfully moving this case forward at the pace the Hague

17

Convention requires. *See* Art. 11, Hague Convention. This Court accordingly concludes that the circumstances warrant the appointment of pro bono counsel to Petitioner.

IV.     **CONCLUSION**

For the foregoing reasons, the Court will **DENY** Respondent's Motion and will **ORDER** the appointment of pro bono counsel for Petitioner. An appropriate Order accompanies this Opinion.

Dated: January 15, 2026

_____
Evelyn Padin, U.S.D.J.